## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **ABDUL-AZEEM MOHAMED,** ) | FILED: NOVEMBER 21, 2008 |
| ) | 08CV6695 |
| ) | JUDGE BUCKLO |
| **Plaintiff,** ) | MAGISTRATE JUDGE COLE |
| ) | CH |
| **v.** ) | |
| ) | |
| **QUEST SOFTWARE, INC.,** ) | **JURY TRIAL DEMANDED** |
| **VIZIONCORE, INC., and** ) | |
| **DAVID BIENEMAN,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## COMPLAINT

Plaintiff, Abdul-Azeem Mohamed, by and through his attorneys, The Law Offices of

Laurie J. Wasserman, complains against Defendants Quest Software Inc., Vizioncore, Inc., and

David Bieneman, as follows:

### NATURE OF THE ACTION

1.      This is an action for violations of Section 10(b) and Rule 10b-5 thereunder of the

Securities Exchange Act of 1934 (the "Exchange Act" or the "1934 Act"), the Illinois Securities

Law of 1953 (the "Illinois Act"), the Illinois Wage Payment and Collection Act, 820 ILCS 115/1

*et seq.* ("IWPCA"), and Illinois common law claims based upon breach of contract, fraudulent

misrepresentation and conversion.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa,

28 U.S.C. §1331 and principles of pendent and supplemental jurisdiction.

1

3.     Venue in this District is proper pursuant to §27 of the Exchange Act because a substantial part of the events or omissions giving rise to the claims raised herein occurred in this District.

## PARTIES

4.     Plaintiff Abdul-Azeem Mohamed ("Plaintiff" or "Mr. Mohamed") is a resident of DuPage County, Illinois.  At all times relevant to this action, he was an employee or prospective employee of Defendants Quest Software Inc. ("Defendant" or "Quest") and Vizioncore, Inc., ("Defendant" or "Vizioncore").

5.     Quest is a California corporation with its principal place of business in California. At all times material hereto, Quest maintained an office in Buffalo Grove, Illinois through its subsidiary, Vizioncore, and had active operations within this judicial district.

6.     Quest designs, develops, distributes and supports software products that improve the performance and productivity of its customers' packaged and custom software applications and associated software infrastructure components.  At all relevant times, Quest's common stock traded on the NASDAQ Stock Market under the symbol "QSFT."

7.     Vizioncore is an Illinois corporation with its principal place of business in Buffalo Grove, Illinois.

8.     Founded in 2002, Vizioncore provides software that helps its customers manage a deployment of a virtual server.  A virtual server is a software platform which allows several "servers" to run as "virtual machines" on one physical server (device).

9.     Vizioncore is a wholly owned subsidiary of Quest.  At all times relevant, Vizioncore was majority owned by Quest and, at a later date, became wholly owned by Quest.

2

10.     Defendant David Bieneman ("Defendant" or "Bieneman" is the founder of Vizioncore and was its Chief Executive Officer ("CEO").

11.     Based upon information and belief, in March 2008, Bieneman stepped down as Vizioncore's CEO.

12.     Based upon information and belief, Bieneman is a resident of Lake County, Illinois.

## FACTS

13.     Plaintiff initially worked for Quest from June 1999 to March 2004.

14.     When Plaintiff voluntarily left Quest in March 2004, his title was Product Marketing Manager.

15.     During Plaintiff's initial employment with Quest, Plaintiff developed a close working relationship with Vincent C. Smith ("Smith").

16.     Smith has served as a Director of Quest since 1995, as Quest's CEO since April 1997 and as Chairman of the Board of Directors of Quest since 1998.

17.     After Plaintiff resigned from his employment with Quest in March 2004, he and Smith continued an amicable relationship with each other.  Following Plaintiff's departure from Quest in March 2004, Smith frequently contacted Plaintiff in an effort to recruit him back to employment with Quest and/or one of its subsidiaries.

18.     At all times relevant, Plaintiff was aware that Smith was Quest's Chairman of the Board of Directors and CEO.

19.     From March 2004 to November 2004, Plaintiff worked for Veritas Software, where he served as an APM Lead Architect.

3

20.     In November 2004, Plaintiff was hired by Mercury Interactive as a Senior Systems Engineer.  Mercury Interactive is a publicly owned company.

21.     In early December 2005, Smith telephoned Plaintiff and told him that Quest had recently invested in a small start-up company called Vizioncore.

22.     Smith suggested that employment at Vizioncore might be a good fit for Plaintiff and encouraged Plaintiff to look at Vizioncore's website.

23.     The following day, Plaintiff telephoned Smith and asked for more information regarding Vizioncore, including contact information and additional background on the company.

24.     In that telephone conversation, Smith praised Vizioncore's CEO, Defendant David Bieneman, stating that Bieneman's efforts resulted in Vizioncore achieving excellent sales, developing a strong technology and having substantial growth possibilities.

25.     In that telephone conversation, Smith told Plaintiff that Quest had a controlling interest in Vizioncore.

26.      In that telephone conversation, Smith told Plaintiff that the purchase by Quest of the minority interest in Vizioncore that Quest did not currently own would be completed by the end of 2006.

27.     In that telephone conversation, Smith told Plaintiff that Vizioncore had a stock option pool and that Vizioncore stock options would be available to Plaintiff if he became employed at Vizioncore.

28.     At the conclusion of that telephone conversation, Smith told Plaintiff that he would e-mail Bieneman and tell him about Plaintiff's background, skill sets and interest in Vizioncore.

29.     In an e-mail dated December 14, 2005, Smith provided Plaintiff and Bieneman with their respective cell phone numbers.

30.     On or about December 15, 2005, Plaintiff called Bieneman and they arranged a dinner meeting at a restaurant in Vernon Hills, Illinois on December 21, 2005.

31.     At their dinner meeting on December 21, 2005, Plaintiff told Bieneman that he was not actively seeking a new job since he enjoyed working at Mercury Interactive and was financially secure with the company.  Plaintiff further stated that he would leave Mercury Interactive only if the right job came along in terms of compensation and the opportunity for career growth.

32.     In response, Bieneman told Plaintiff that Bieneman needed Plaintiff to help grow Vizioncore's market, to "shadow" him, and to rebuild Vizioncore's website.

33.     At that meeting, Bieneman emphasized to Plaintiff that he was looking for an executive type of individual like Plaintiff who could boost Vizioncore's marketing potential and deliver presentations at conferences, create messaging and train the sales force.

34.     In early January 2006, Plaintiff met with Bieneman at Vizioncore's office in Buffalo Grove, Illinois.

35.     That same day, Plaintiff also met with Vizioncore employees Jason Mattox, David Feathergil, Maja McMillin, and Chris Akerberg.

36.     At that meeting, Plaintiff and Bieneman discussed Vizioncore's financial status, product line and the role Bieneman envisioned Plaintiff playing with the company.

37.     At that meeting, Bieneman told Plaintiff that in 2005 Quest purchased 75% of Vizioncore's capital stock and that Quest's purchase of the remaining 25% of Vizioncore's shares would be completed by the end of 2006.

5

38.     At that meeting, Bieneman told Plaintiff that following Quest's purchase of 75% of Vizioncore in 2005, Bieneman paid $100,000 to Jason Mattox and $100,000 to David Feathergil for their contributions in founding Vizioncore and growing the company.

39.     At that meeting, Bieneman told Plaintiff that there was a Vizioncore stock option pool.

40.     At that meeting, Bieneman told Plaintiff that Bieneman, Jason Mattox, David Feathergil, and Chris Akerberg had been granted Vizioncore stock options.

41.     At that meeting, Plaintiff repeated to Bieneman that he was not in the market for a new job since he enjoyed working at Mercury Interactive and was financially secure with the company. Plaintiff repeated his previous statement that he would leave Mercury Interactive only if the right job came along in terms of compensation and the opportunity for career growth.

42.     Following the on-site meeting in early January 2006, Bieneman telephoned Plaintiff and asked him how he thought the meeting had gone. Bieneman also told Plaintiff that he would be making him an offer of employment.

43.     In that conversation Bieneman asked Plaintiff if he had a rough idea of "where he needed to be" financially.

44.     In response, Plaintiff told Bieneman that he currently had a base salary of $113,000 and with incentives grossed $150,000 per year and that his current employer had granted to him lucrative stock options.

45.     Plaintiff also told Bieneman in that conversation that in order to leave his current employer, which was a publicly owned company, he would need a base salary of at least $100,000, plus Vizioncore stock options and an incentive bonus.

6

46.     In response, Bieneman reminded Plaintiff that Vizioncore had a stock option pool.

47.     Plaintiff understood that stock options in Vizioncore would give him the right to buy Vizioncore stock in the future at a fixed price equal to or possibly less than the fair market value of the stock on the date of the grant, which is known as the "exercise" or "strike" price.

48.     When Plaintiff told Bieneman that he would require Vizioncore stock options as a condition of his employment with Vizioncore, Plaintiff understood that the lower the strike price, the more potential profit would be realized when the option is eventually exercised.

49.     Therefore, Plaintiff understood that when Quest purchased the remaining 25% shares of Vizioncore at the end of 2006, Vizioncore employees with stock options would have the opportunity to make a substantial profit based upon their ability to exercise their Vizioncore stock options at that time at a strike price lower than the buy-out price.

50.     In a further effort to gain additional information regarding Quest's pending buy-out of the remaining 25% of Vizioncore stock, in early January 2006, Plaintiff telephoned W. Brinkley Morse ("Morse"), Quest's Senior Vice President, Corporate Development, a position Morse held until his resignation on or about November 24, 2006.

51.     Morse previously served as Vice President, Finance and Operations of Quest from January 2001 through May 2003 and as Quest's Chief Financial Officer ("CFO") from May 2003 through April 2005.

52.     Plaintiff knew Morse through his previous employment with Quest.  Plaintiff knew that Morse previously served as Quest's Vice President, Finance and Operations, and had also served as Quest's CFO, and was therefore intimately familiar with Quest and Vizioncore.

7

53.     In that telephone conversation, Plaintiff explained to Morse that he enjoyed his job at Mercury Interactive and had a financially secure position with the company.

54.     In that telephone conversation, Plaintiff also told Morse that the only reasons he would consider leaving Mercury Interactive for Vizioncore would be to have the opportunity to help grow Vizioncore and to receive a grant of potentially lucrative stock options.

55.     Plaintiff told Morse that he could not accept employment with Vizioncore until he knew the strike price of the stock options he was to receive.

56.     Morse assured Plaintiff that he had "personal knowledge" that there was a "pool of 168,500 shares" of Vizioncore stock available for option grants, but that the value (strike price) was not yet "legalized" because the terms and conditions of the sale of Vizioncore to Quest were not fully finalized.

57.     Plaintiff also asked Morse when he anticipated that the remaining 25% of the sale of Vizioncore to Quest would be completed.

58.     In response, Morse stated that the sale would be completed by the end of 2006 and that Vizioncore would remain an independent subsidiary of Quest.

59.     Morse told Plaintiff to "rest assured" that there would be a significant payout to holders of stock options at the end of 2006 when the sale of Vizioncore to Quest was completed.

60.     Morse also told Plaintiff that he understood that Plaintiff would leave Mercury Interactive for a start-up company like Vizioncore only if Plaintiff received assurances that he would receive Vizioncore stock options.

61.     On or about January 15, 2006, Plaintiff and Bieneman met for dinner at a restaurant in Vernon Hills, Illinois.

8

62.     At the dinner meeting, Bieneman offered Plaintiff employment with Vizioncore at a base salary of $85,000 plus options to purchase approximately 10,000 Vizioncore shares plus an incentive bonus.

63.     Bieneman told Plaintiff that he had sent the offer in an e-mail to Plaintiff, however, Plaintiff had not yet seen the e-mail prior to their dinner meeting.

64.     Attached hereto as Exhibit A is a copy of the e-mail referenced in paragraph 63, which Plaintiff received on or about January 18, 2006.

65.     At their dinner meeting, Plaintiff asked Bieneman if the strike price of Vizioncore stock options had been established.

66.     Based upon Plaintiff's previous conversation with Morse, Plaintiff reasonably believed that the strike price of Vizioncore stock options would be included in the written employment offer letter from Vizioncore to Plaintiff.

67.     In response to Plaintiff's question regarding the strike price, Bieneman told Plaintiff that he did not know what the strike price was, but that he did know that the stock option pool "paperwork" was not yet completed.

68.     At their dinner meeting, Bieneman also told Plaintiff that he was certain that the stock option pool "paperwork" would be completed within the "next couple of weeks."

69.     In their discussion regarding the Vizioncore stock options to be granted to Plaintiff, Bieneman told Plaintiff that Plaintiff would receive a minimum of $500,000 following the completion of Quest's buy-out of Vizioncore at the end of 2006.

70.     At their dinner meeting, Plaintiff told Bieneman that the base salary was too low and rejected the employment offer.   However, the parties agreed that they would continue their negotiations.

9

71.    Thereafter, Plaintiff telephoned Bieneman and asked if Morse had completed the stock option pool "paperwork" so that the strike price of his stock options could be included in a revised employment offer letter.

72.    Bieneman told Plaintiff that he thought knowing the number of Vizioncore shares available in the stock option pool would be sufficient information for Plaintiff to have in making his decision to accept employment with Vizioncore.

73.    Plaintiff told Bieneman that he would not accept employment with Vizioncore without knowing the strike price of his options.

74.    Bieneman then told Plaintiff that he would call Morse the following day in order to try and learn the strike price. However, Bieneman also insisted that the terms and conditions of the sale of the remaining 25% of Vizioncore shares would be finalized within the next few weeks, at which time he was certain that the strike price would be set. Bieneman did not indicate to Plaintiff what the relationship would be between the sale price of the 25% interest and the strike price or why the strike price could not be set prior to the finalization of the sale terms.

75.    In that telephone conversation, Bieneman represented to Plaintiff that Morse was the "go-to" person in the negotiations with respect to Quest's purchase of the minority stake of Vizioncore, the completion of stock option pool "paperwork" and the determination of the strike price of the Vizioncore stock options.

76.    In that telephone conversation, Plaintiff again rejected the offer of $85,000 in base compensation and options to purchase 10,000 shares of Vizioncore stock; however, Bieneman and Plaintiff stayed on the telephone in a further attempt to negotiate acceptable terms and conditions of Plaintiff's employment with Vizioncore.

10

77.     Bieneman then offered Plaintiff a base salary of $100,000, options to purchase 13,250 Vizioncore shares and four quarterly incentive bonuses of $10,000 each.

78.     Plaintiff asked Bieneman to put the offer in writing.

79.     On or about January 17, 2006, Bieneman telephoned Plaintiff and reiterated the employment offer of a base salary of $100,000, options to purchase 13,250 Vizioncore shares and four quarterly incentive bonuses of $10,000 each.

80.     Plaintiff then asked Bieneman if Morse had informed him of the strike price of the Vizioncore stock options.

81.     Bieneman told Plaintiff that the strike price was not yet determined, but again assured Plaintiff that the terms and conditions of the sale of the remaining 25% of Vizioncore shares would be finalized within the next few weeks, at which time Bieneman was certain that the strike price would be set.

82.     In that telephone conversation, Bieneman also told Plaintiff that the strike price for Plaintiff's Vizioncore stock options would be the same strike price as Bieneman's stock options.

83.     In addition, Bieneman told Plaintiff that he could not offer him any additional stock options because he could not give Plaintiff more stock options than Vizioncore's Vice President of Sales, Chris Akerberg.

84.     Plaintiff again asked that Bieneman reduce the employment offer to writing.

85.     The offer, dated January 17, 2006, was memorialized in an e-mail, attached hereto and incorporated herein as Exhibit B, which was sent from Bieneman to Plaintiff on January 20, 2006.

11

86.     The offer letter (Exhibit B) states as follows with respect to compensation,

benefits and performance review:

> **Compensation:**
>
>> **Salary:** Annual gross starting salary of $100,000 paid in weekly
>> installments by your choice of check or direct deposit.
>
>> **Performance Bonus:** $10,000 per quarter as you fulfill your quarterly
>> objectives (or best efforts to fulfill objectives) - sample objectives
>> attached
>
> **Benefits**
>
>> **Options:** A grant of 13,250 stock options from the Vizioncore option
>> pool
>
>> **Insurance:** Health and dental insurance (HMO or PPO) up to $250 a
>> month will be paid by Vizioncore
>
>> **Vacation:** Vacation and personal days as shown in our employee manual
>> (vacation days will be 1 day per month for an increased total resulting
>> into 12 vacation days per year)
>
> **Performance Review**
>
>> **Option Pool:** A review of the 1st half of the year with the intent to grant
>> additional options to yourself.

87.     Upon receipt, Plaintiff forwarded the offer letter (Exhibit B) via e-mail to Smith

and Morse.

88.     At all times relevant during the course of Plaintiff's recruitment by Defendants'

agents Smith, Morse and Bieneman, and Bieneman, acting in his individual capacity, represented

to Plaintiff that they had full authority to act on behalf of Quest and Vizioncore and to negotiate

the terms and conditions of Plaintiff's employment.

89.     At all times relevant during the course of Plaintiff's recruitment by Defendants'

agents Smith, Morse and Bieneman, and Bieneman, acting in his individual capacity, Plaintiff

relied upon Bieneman's, Morse's and Smith's authority to act on behalf of Quest and Vizioncore, and to negotiate the terms and conditions of Plaintiff's employment.

90.     During the course of Plaintiff's recruitment, Quest and Vizioncore, through their agents Smith, Morse and Bieneman, and Bieneman, acting in his individual capacity, knew that Plaintiff would be accepting a decrease in his base salary with Mercury Interactive in order to accept Defendants' job offer.

91.     During the course of Plaintiff's recruitment, Quest and Vizioncore, through their agents Smith, Morse and Bieneman, and Bieneman, acting in his individual capacity, knew that Plaintiff would be accepting a decrease in his incentive bonuses with Mercury Interactive in order to accept Vizioncore's job offer.

92.     During the course of Plaintiff's recruitment, Quest and Vizioncore, through their agents Smith, Morse and Bieneman, and Bieneman, acting in his individual capacity, knew that Plaintiff relied on their representations that Plaintiff would receive a minimum of $500,000 upon the exercise of his Vizioncore stock options in connection with Quest's buy-out of Vizioncore.

93.     During the course of Plaintiff's recruitment, Quest and Vizioncore, through their agents Smith, Morse and Bieneman, and Bieneman, acting in his individual capacity, knew that Plaintiff relied on their representations that there were 168,500 shares of Vizioncore stock in the Vizioncore stock option pool, and on the January 17, 2006 offer letter pursuant to which Plaintiff was offered options to purchase 13,250 Vizioncore shares.

94.     During the course of Plaintiff's recruitment, Quest and Vizioncore, through their agents Smith, Morse and Bieneman, and Bieneman, acting in his individual capacity, knew that Plaintiff relied on their representations that the strike price of the Vizioncore stock would be

13

determined when the terms and conditions of the sale of the remaining 25% of Vizioncore to Quest was finalized.

95.     During the course of Plaintiff's recruitment, Quest and Vizioncore, through their agents Smith, Morse and Bieneman, and Bieneman, acting in his individual capacity, knew that Plaintiff relied on their representations that the terms and conditions of the purchase by Quest of the remaining 25% interest in Vizioncore would be finalized by the end of January 2006.

96.     During the course of Plaintiff's recruitment, Quest and Vizioncore, through their agents Smith, Morse and Bieneman, and Bieneman, acting in his individual capacity, knew that Plaintiff relied on their verbal and written representations that Plaintiff would be granted options to purchase 13,250 shares from the Vizioncore stock option pool upon his acceptance of employment with Vizioncore.

97.     During the course of Plaintiff's recruitment, Quest and Vizioncore, through their agents Smith, Morse and Bieneman, and Bieneman, acting in his individual capacity, knew that Plaintiff relied on their verbal and written representations that Plaintiff would be granted additional stock options following a successful mid-year performance review.

98.     Defendants made the aforesaid statements and promises in order to induce Plaintiff to resign his position with Mercury Interactive and accept Vizioncore's offer of employment so as to enable Vizioncore to avail itself of Plaintiff's experience, reputation and expertise.

99.     In reliance upon Defendants' offer, including but not limited to their verbal and written representations that he would be granted options to purchase 13,250 Vizioncore shares from the Vizioncore stock option pool upon commencement of employment, additional stock

14

options after a successful mid-year performance review and that terms and conditions of the sale of the remaining 25% of Vizioncore shares would be finalized within the next few weeks at which time the strike price of the Vizioncore stock options would be set, Plaintiff accepted the offer of employment in an e-mail to Bieneman sent on January 22, 2006.

100. Based upon information and belief, Defendants' agents Smith, Morse and Bieneman, and Bieneman, acting in his individual capacity, who had the authority to approve the terms and conditions of Plaintiff's employment, were aware that Defendants had previously agreed that the strike price of Plaintiff's stock options would be established upon the finalization of the terms and conditions of the sale of the remaining 25% of the controlling shares of Vizioncore to Quest.

101. Based upon information and belief, Defendants' agents Smith, Morse and Bieneman, and Bieneman, acting in his individual capacity, who had the authority to approve the terms and conditions of Plaintiff's employment, were aware that Plaintiff was told that he would make a minimum of $500,000, i.e., the difference between the strike price and the buy-out price, following the completion of Quest's buy-out of Vizioncore at the end of 2006.

102. On or about February 7, 2006, Plaintiff began working for Defendants at Vizioncore's Buffalo Grove office.

103. In March 2006, Defendants hired Scott Harold to work at Vizioncore as a Technologist.

104. Based upon information and belief, Scott Harold was also offered Vizioncore stock options, and, like Plaintiff, was not apprised of the strike price of his options.

15

105.    In March, April and May 2006, Plaintiff sent several e-mails to Bieneman asking if the strike price of his Vizioncore stock options had been determined.

106.    In response to each e-mail, Bieneman replied that he and Morse were still working on the strike price and that he would let Plaintiff know when the price was set.

107.    In a further attempt to induce Plaintiff to remain employed at Vizioncore and curtail Plaintiff's inquiries about the strike price, on several occasions in February, March, April and May 2006, Bieneman represented to Plaintiff that based upon the growth in Vizioncore revenues, Plaintiff would receive over one million dollars upon the exercise of his Vizioncore stock options in connection with Quest's buy-out of Vizioncore.

108.    In June 2006, Plaintiff sent an e-mail to Bieneman again asking if the strike price of his Vizioncore stock options had been determined.

109.    Bieneman never responded to the June 2006 e-mail.

110.    In mid-July 2006, Plaintiff attended a weekly Monday morning management meeting with Chris Akerberg, Scott Harold, David Feathergil, Jason Mattox, Maja McMillin and Bieneman.

111.    At the meeting, Scott Harold asked Bieneman if the strike price of his Vizioncore stock options had been determined yet.

112.    In response, Bieneman said no, apologized for the delay and said that "this gets away from Brinkley Morse and me." Bieneman then stated that he would get it settled and that "all of you are having your options doubled."

113.    Following the meeting, Plaintiff sent Bieneman an e-mail confirming the doubling of the stock options.

16

114.   From August 2006 thru November 2006, Plaintiff asked Bieneman on an approximately weekly basis if the strike price had been determined yet.

115.   Bieneman consistently responded "no" and appeared agitated and angry that Plaintiff repeatedly asked him about the strike price.

116.   On or about November 24, 2006, Quest issued an announcement that on November 18, 2006, the Board of Directors of Quest, upon the recommendation of the Special Committee formed by Quest to investigate Quest's historical stock option grants practices and related accounting, unanimously accepted the resignation, effective immediately, of Morse.

117.   Quest further stated in its announcement that, prior to his resignation, Morse's counsel had informed the Special Committee that Morse declined to be interviewed by the Special Committee as part of its investigation.

118.   Following the announcement of Morse's resignation, on or about November 28, 2006, Bieneman stated at a Vizioncore managers' meeting that there were no Vizioncore stock options available for any Vizioncore employees.

119.   Plaintiff was shocked to learn that there were no Vizioncore stock options available for Vizioncore employees since he had Defendants' repeated verbal and written assurances dating back to January 2006 and continuing for the following ten months, that Vizioncore stock options were part of his compensation package.

120.   Plaintiff thereafter contacted Mike Coffman, Quest's Vice President of Corporate Development, in an effort to ascertain the status of the Vizioncore stock options.

121.   In a series of e-mails and phone calls from November 2006 through mid-February 2007, Mike Coffman represented to Plaintiff that he was confident that there were Vizioncore

stock options remaining in the stock option pool and that he had raised the issue with Smith.

122.    However, by mid-February 2007, it became apparent to Plaintiff that there were no Vizioncore stock options because neither Plaintiff nor his colleagues received any verbal or written confirmation from Bieneman, Smith or any other Quest or Vizioncore agent, that Vizioncore would honor its prior commitment to grant stock options to Plaintiff, Jason Mattox, David Feather, Chris Akerberg and Scott Harold.

123.    As a result of Vizioncore's failure to fulfill its obligations to Plaintiff to grant to him options to purchase at least 13,250 Vizioncore shares, Plaintiff resigned from his employment with Vizioncore on or about March 27, 2007.

124.    Based upon information and belief, Vizioncore also failed to fulfill its obligations to Jason Mattox, David Feathergil, Chris Akerberg and Scott Harold to grant options to purchase Vizioncore shares.

125.    Based upon information and belief, Quest completed its purchase of the remaining 25% of Vizioncore in January 2008.

126.    Defendants' conduct deprived Plaintiff of the opportunity to exercise his options and profit from the sale of the remaining 25% of Vizioncore as had been previously represented to him.

## COUNT I - VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 THEREUNDER

127.    Plaintiff realleges and adopts Paragraphs 1 through 126 above as though fully set forth herein.

18

128.     The term "security" is defined in the Exchange Act to include "any option, or privilege on any security."

129.     By granting an option to purchase Vizioncore shares to Plaintiff in consideration of Plaintiff accepting Vizioncore's offer of employment and providing services to Vizioncore during the term of his employment, Vizioncore sold a security to Plaintiff and Plaintiff purchased a security from Vizioncore in reliance on Defendants' false and misleading statements of material facts.

130.     Defendants with scienter, in connection with the sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon Plaintiff.

131.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

WHEREFORE, Plaintiff, Abdul-Azeem Mohamed prays for judgment in his favor and against Defendants Quest Software Inc., Vizioncore Inc., and David Bieneman, in an amount to be determined at trial, but in no event less than $500,000, plus interest, court costs, attorneys' fees and any further relief the Court deems just and appropriate.

## COUNT II - VIOLATIONS OF SECTION 12 OF THE ILLINOIS ACT

132.     Plaintiff realleges and adopts Paragraphs 1 through 126 above as though fully set forth herein.

19

133.    Under Section 2.1 of the Illinois Act, the term "security" is defined to include "any option or privilege on any security" and under Section 2.5 of such act the term "sale" includes "every disposition of a security for value."

134.    By granting an option to purchase Vizioncore shares to Plaintiff in consideration of Plaintiff accepting Vizioncore's offer of employment and providing services to Vizioncore during the term of his employment, Vizioncore sold a security to Plaintiff, and Plaintiff purchased a security from Vizioncore in reliance on Defendants' false and misleading statements of material facts.

135.    Defendants (i) engaged in a transaction, practice or course of business in connection with the sale or purchase of securities which worked or tended to work a fraud or deceit upon Plaintiff; (ii) circulated statements and other papers and documents pertaining to securities knowing or having reasonable grounds to know any material representation contained therein was false or untrue; or (iii) employed devices, schemes or artifices to defraud in connection with the sale of securities, directly or indirectly.

136.    By reason of the foregoing, Defendants violated Section 12 of the Illinois Act.

WHEREFORE, Plaintiff, Abdul-Azeem Mohamed prays for rescission of the purchase and judgment in his favor and against Defendants, Quest Software Inc., Vizioncore, Inc., and David Bieneman, in an amount to be determined at trial, but in no event less than $500,000, plus interest, court costs, attorneys' fees and any further relief the Court deems just and appropriate.

## COUNT III - VIOLATIONS OF THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT

137.    Plaintiff realleges and adopts Paragraphs 1 through 126 above as though fully set forth herein.

20

138.    At all times relevant, Section 2 of the IWPCA, 820 ILCS §115/2, provided in relevant part, as follows:

> For all employees, other than separated employees, "wages" shall be defined as any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation. Payments to separated employees shall be termed "final compensation" and shall be defined as wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the two parties.

139.    Defendants are employers and Plaintiff is an employee as defined in the IWPCA.

140.    As part of Plaintiff's compensation, Vizioncore agreed to grant Plaintiff options to purchase 13,250 shares of Vizioncore stock.

141.    As a continued part of Plaintiff's compensation, Vizioncore agreed to double the number of Vizioncore shares subject to Plaintiff's options.

142.    From the date of his termination, through the present, Defendants have failed to tender to Plaintiff the value of his stock options and grants owed to him.

143.    At all times relevant, Section 14 of the IWPCA, 820 ILCS 115/14(b) states in its entirety as follows:

> (b)    Any employer who has been ordered by the Director of Labor or the court to pay wages due an employee and who shall fail to do so within 15 days after such order is entered shall be liable to pay a penalty of 1% per calendar day to the employee for each day of delay in paying such wages to the employee up to an amount equal to twice the sum of unpaid wages due the employee.

21

WHEREFORE, Plaintiff, Abdul-Azeem Mohamed prays for judgment in his favor and against Defendants, Quest Software Inc., Vizioncore, Inc., and David Bieneman, and specifically asks for such relief as is appropriate under the IWPCA, make him whole for damages and financial losses suffered, including all statutory and common law, punitive and compensatory damages, plus interest, court costs, attorneys' fees and any further relief the Court deems just and appropriate.

## COUNT IV - BREACH OF CONTRACT

144.     Plaintiff realleges and adopts Paragraphs 1 through 126 above as though fully set forth herein.

145.     Pursuant to Defendants' representations, Plaintiff was offered options to purchase 13,250 Vizioncore shares upon the commencement of his employment in February 2006.

146.     Plaintiff accepted the offer and gave consideration as set forth above.

147.      Defendants' acts and omissions constitute a breach of contract.

148.     As a direct and proximate result of Defendants' breach, Plaintiff has suffered and continues to suffer substantial financial harm.

WHEREFORE, Plaintiff, Abdul-Azeem Mohamed prays for judgment in his favor and against Defendants, Quest Software Inc., Vizioncore, Inc., and David Bieneman, and specifically asks the Court to order Defendants to make Plaintiff whole for the damages and losses suffered, including compensatory damages, interest, court costs and any further relief the Court deems just and appropriate.

## COUNT IV - FRAUDULENT MISREPRESENTATION

149.     Plaintiff realleges and adopts Paragraphs 1 through 126 above as though fully set forth herein.

22

150. By their conduct as alleged above, Defendants made or assisted or participated in making false representations to Plaintiff, Jason Mattox, David Feathergil, Chris Akerberg and Scott Harold as part of a scheme to defraud, knowing the representations were false or reckless without regard to whether they were true or false.

151. Plaintiff justifiably relied on these representations, including but not limited to the representations that (a) that if he accepted the job offer with Vizioncore, he would receive as part of his compensation package options to purchase 13,250 shares of Vizioncore stock; (b) as of January 2006, there were at least 168,500 shares of Vizioncore stock available in the Vizioncore stock option pool; (c) the strike price for the Vizioncore stock options would be determined following the finalization of the terms and conditions of the remaining 25% of the sale of the remaining ownership of Vizioncore to Quest; (d) when established, the strike price would result in Plaintiff realizing a substantial profit upon the acquisition by Quest of the remaining 25% interest in Vizioncore; (e) Plaintiff's stock options with Vizioncore were doubled in July 2006 from 13,250 to 26,500; (f) as of January 2006, the amount to be realized by Plaintiff upon the exercise of the stock options in connection with the buy-out of Vizioncore by Quest was a minimum of $500,000; and (g) as of May 2006, based upon Vizioncore's increased revenue, Plaintiff would receive over one million dollars upon the exercise of his Vizioncore stock options in connection with Quest's buy-out of Vizioncore.

152. As a result of his reliance on such representations, Plaintiff suffered monetary losses.

153. The conduct of Defendants toward Plaintiff was wanton and malicious and reflects a conscious disregard of Plaintiff's rights, warranting the imposition of punitive damages.

23

WHEREFORE, Plaintiff, Abdul-Azeem Mohamed prays for judgment in his favor and against Defendants, Quest Software Inc., Vizioncore, Inc., and David Bieneman, and specifically asks the Court to order Defendants to make Plaintiff whole for the damages and losses suffered, including compensatory and punitive damages, interest, court costs and any further relief the Court deems just and appropriate.

## COUNT V - CONVERSION

154.    Plaintiff realleges and adopts Paragraphs 1 through 126 above as though fully set forth herein.

155.    Pursuant to Defendants' representations, as set forth above, Plaintiff is the owner of stock options to buy 26,500 shares of Vizioncore stock.

156.    Per Defendants' representations, as set forth above, upon payment of the exercise price, Plaintiff was to have the right to acquire immediate ownership of 26,500 shares of Vizioncore stock.

157.    In committing the acts described above, Defendants have wrongfully taken ownership and control over 26,500 Vizioncore shares that were subject to Plaintiff's stock options and thereby deprived Plaintiff of the benefits that he was to have received from the sale of 26,500 shares of Vizioncore stock to Quest in January 2008.

158.    Despite demands by Plaintiff through his attorneys for distribution to him of the 26,500 shares of Vizioncore stock, Defendants have failed to return these shares to Plaintiff or to deliver to Plaintiff the proceeds of the sale of the 26,500 shares of Vizioncore stock that were included in the sale of the remaining minority interest of Vizioncore to Quest in January 2008.

159.    As a result of Defendants' actions, Plaintiff has suffered and will continue to suffer

24

loss, control and benefit of the 26,500 shares of Vizioncore stock and the proceeds of the sale of such shares to Quest in January 2008.

160.  The conduct of Defendants toward Plaintiff was wanton and malicious and reflects a conscious disregard of Plaintiff's rights, warranting the imposition of punitive damages.

WHEREFORE, Plaintiff, Abdul-Azeem Mohamed prays for judgment in his favor and against Defendants, Quest Software Inc., Vizioncore, Inc., and David Bieneman, and specifically asks the Court to order Defendants to make Plaintiff whole for the damages and losses suffered, including compensatory and punitive damages, interest, court costs and any further relief the Court deems just and appropriate.

Dated: November 21, 2008

/s/ Laurie J. Wasserman
One of Plaintiff's Attorneys

Laurie J. Wasserman, #3124845
ljw@webemploymentlaw.com
Carol G. Silverman, #6189650
cgs@webemploymentlaw.com
Law Offices of Laurie J. Wasserman
9933 Lawler Avenue, Suite 122
Skokie, Illinois 60077
Telephone: (847) 674-7324
Facsimile:  (847) 674-6684